**In re CAFETERIA OPERATORS, L.P., et al., Debtors.**

No. 03–30179 HDH–11.

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Aug. 29, 2003.

Samuel M. Stricklin, Bracewell and Patterson, Dallas, TX, for Debtors.

Richard G. Dafoe, Vial, Hamilton, Koch and Knox, Dallas, TX, for Cherrco, Inc.

### MEMORANDUM OPINION REGARDING CHERRCO INC.'S MOTION TO COMPEL PAYMENT OF PACA TRUST CLAIM

HARLIN D. HALE, Bankruptcy Judge.

The issue before this Court is whether the proceeds of food commodities delivered to the Debtor are impressed with a trust for the benefit of a claimant pursuant to the Perishable Agricultural Commodities Act ("PACA").

On July 21, 2003, Cherrco, Inc. ("Cherrco") filed a Motion to Compel Payment of PACA Trust Claim in which Cherrco seeks an order from this Court compelling the Debtors to pay the claim of Cherrco that arose under PACA. A hearing was held in this matter on August 15, 2003. For the reasons set forth below, the Court finds that Cherrco is entitled to the

trust benefits under PACA and, therefore, grants Cherrco's motion.

### Perishable Agricultural Commodities Act ("PACA")

 The Perishable Agricultural Commodities Act was enacted in 1930 to regulate the sale of perishable commodities and promote fair dealing in the sale of fruits and vegetables. *See, Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.*, 336 F.3d 410, (5th Cir. 2003). In 1984, PACA was amended to extend its protection to sellers of perishable commodities who, theretofore, were often unsecured creditors of buyers whose creditworthiness they were unable to evaluate before the sale. *Id.* To remedy this problem, Congress added § 499e which "create[s], immediately upon delivery, a nonsegregated 'floating' trust in favor of sellers on the perishable commodities sold and the products and proceeds derived from the commodities." *Id.* Pursuant to regulations enacted by the United States Department of Agriculture,

> When a seller, supplier or agent who has met the eligibility requirements of paragraphs (e)(1) and (2) of this action, transfers ownership, possession, or control of goods to a commission merchant, dealer, or broker, it automatically becomes eligible to participate in the trust. Participants who preserve their rights to benefits in accordance with paragraph (f) of this section remain beneficiaries until they are paid in full.

7 C.F.R. § 46.46(c)(1). Pursuant to PACA regulations, payment for shipment of perishable commodities is due within ten days after delivery unless the parties agree to extend the payment term beyond the ten days and such agreement is in writing before entering into the transaction.... 7 C.F.R. § 46.46(e)(1). Under § 46.46(e)(2) "[t]he maximum time for payment for a shipment to which a seller, supplier, or agent can agree and still qualify for coverage under the trust is 30 days after receipt and acceptance of the commodities...." Thus, a written agreement between the parties extending the payment term beyond the thirty days allowed in the regulations would place the transaction outside the scope of the PACA trust provisions.

### Cherrco's Claim

The facts giving rise to the claim asserted by Cherrco are undisputed. Cherrco is a Michigan corporation engaged in the business of wholesale food distribution. On various occasions prior the filing of the bankruptcy, the Debtor placed orders with Cherrco in the ordinary course of business for cherries for delivery to various locations of the Debtor, which operates cafeterias, primarily in the southwest. These orders were placed through Tim Dent ("Dent") of George E. Dent Sales, Inc., an agent or broker for Cherrco, Inc. Cherrco made delivery of all of the items ordered, and the Debtor accepted delivery. The invoices sent in connection with the transactions at issue provided for terms of payment of net 30 days. The Debtor failed to pay for the shipments within the thirty days required in the invoices. Cherrco properly preserved its rights to claim its PACA trust beneficiary status pursuant to § 46.46(c)(1). Subsequently, Dent, as agent for Cherrco, and Gene Baldwin ("Baldwin"), the representative of the Debtor, began negotiating a payment plan that would pay Cherrco's claim over time. Several e-mails were exchanged, and, eventually, the Debtor began paying Cherrco every week on the claim. On January 3, 2003, however, Furr's filed its petition for relief in this bankruptcy case. The amount owing on the claim as of the petition date was $25,269.12. On January 10, 2003, a week after the filing of the bankruptcy petition, the Debtor filed a Motion for Authority to Pay Pre–Petition

Claims Under the Perishable Agricultural Commodities Act and the Packers and Stockyard Act. An Order Authorizing Payment of Valid Claims was served on March 7, 2003. On January 31, 2003, Cherrco served on the Debtor its Notice of Intent to Preserve Trust Benefits pursuant to PACA ("Notice"). Cherrco asserts that, in addition to the PACA claim amount, it is entitled to recover costs and attorney's fees. The Debtor has refused to pay Cherrco's PACA claim on the basis that Cherrco waived its rights to the PACA trust claim.

### Analysis

There is no dispute between the parties that Cherrco met the requirements of § 46.46(c)(1) and became entitled to the protections of a PACA trust. The Debtors argue that, *after* Cherrco became entitled to the trust, but before its claim was paid in full, Cherrco waived the rights that it otherwise had to the trust benefits by agreeing, in writing, to extend the payment term beyond the thirty days allowed by the regulations. The Debtors cite several appellate court cases that have held that a post-default agreement, in writing, in which the seller agrees to forbear enforcing its rights under PACA in exchange for payments by the buyer causes the seller to lose its rights under the trust.

The Eighth Circuit, in *Tom Lange Co., Inc. v. Lombardo Fruit and Produce Co. (In re Lombardo Fruit and Produce Co.)*, 12 F.3d 806 (8th Cir.1993), addressed this issue. In *Lombardo,* the parties had entered into a written agreement stating that the credit terms for all transactions were net thirty days from the date of shipment. This agreement complied with the terms of PACA and its regulations. However, all of the invoices sent in connection with each individual transaction stated that they were considered overdue if not paid within forty-five days. Over the course of the

relationship, Lombardo paid only one out of 120 transactions within the thirty days required by the parties' written agreement. The supplier eventually stopped selling produce to Lombardo because Lombardo owed the supplier substantial sums of money. As a result of post-default negotiations, the parties entered into several agreements, including an agreement, in writing, to extend the time for payment on the account by an additional twenty weeks. The Court upheld the district court's finding that the parties modified the written agreement by extending the payment term beyond the thirty days allowed by the regulations and that the supplier was, therefore, no longer entitled to the protection of the PACA trust. The Court based its reasoning on the fact that at the time the supplier sought to enforce its PACA rights, it no longer had an agreement complying with PACA:

> Thus, at the time trust protection is claimed, there must exist a valid written agreement complying with PACA's terms. Though such an agreement once existed, it did not exist at the time trust protection was claimed, having been modified by the parties' subsequent written agreement in such a manner that it no longer complied with PACA.

*Lombardo,* 12 F.3d at 810.

The Seventh Circuit has also addressed the issue. In *Greg Orchards & Produce, Inc. v. Roncone,* 180 F.3d 888 (7th Cir. 1999), the court stated that the issue before it was, "whether a produce supplier becomes ineligible to assert its PACA trust rights when it enters into a forbearance agreement with a dealer extending the dealer's time for payment beyond 30 days from the receipt and acceptance of the produce." The Seventh Circuit adopted the reasoning in *Lombardo* and reversed the district court below which had rejected the holding of *Lombardo,* as applied to

similar facts, and had held that the supplier remained qualified for coverage under the PACA trust even though it had entered into a written post-default forbearance agreement. Citing 7 C.F.R. § 46.46(c)(1), the district court reasoned that "the rights to a PACA trust are vested in the seller upon timely notification of the debtor and the USDA of the seller's intent to preserve trust benefits. The seller remains a beneficiary of the PACA trust until the debt owed the seller is paid 'in full.'" *Id.* at 892 (quoting *Weis–Buy Services Inc. v. Roncone*, 1997 WL 323523 at *8 (N.D.Ill. June 9, 1997)). After noting that forbearance is a perfectly reasonable response to a debtor who cannot pay his debts, the district court concluded that the "post-default agreements do not alter the 'terms of the underlying agreement' unless 'expressly purposed to supplant the trust or designed to circumvent the PACA requirements.'" *Id.* (citing *id.*). In rejecting the district court's reasoning, the Seventh Circuit stated that 7 C.F.R. § 46.46(c)(1) "means nothing more than that suppliers need not take further action to preserve their trust rights once they have complied with the notice requirements of PACA and its regulations." The court concluded that "[a] supplier who becomes ineligible for coverage under the trust, however, has nothing left to preserve."

In a more recent case, relied upon heavily by the Debtor in the instant case, the Seventh Circuit held that an exchange of letters between a supplier and a buyer constituted a written post-default agreement that extended the dealer's time for payment beyond 30 days, making the supplier ineligible to assert its PACA rights. *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 672 (7th Cir.2002). In *Patterson*, the court cited *Greg Orchards* and *Lombardo* for the legal conclusion that "[i]f a produce supplier enters a written post-default agreement with a dealer that extends the dealer's time for payment beyond 30 days, the supplier becomes ineligible to assert its trust rights." *Id.* at 669. The court noted that it was bound to follow its earlier decision in *Greg Orchards* regarding this issue and, therefore, started from this statement of the law as its premise in addressing the issue before it: whether the post-default exchange of letters constituted a "written agreement" between the parties extending the payment terms beyond 30 days. The court specifically addressed the issue of whether a "written agreement" meant "merely a writing sufficient to satisfy the Statute of Frauds or an actual executed agreement signed by both parties and integrating all relevant terms." Holding that a "written agreement," for purposes of PACA, meant "a written agreement that satisfies the generally applicable Statute of Frauds," *id.* at 671, the court found that the parties' exchange of letters constituted a written agreement extending the payment terms beyond 30 days causing the supplier to lose its PACA rights. *Id.* at 672.

Each of these cases recognized a rule of law announced in earlier cases that an *oral* agreement or a course of dealing allowing more than 30 days for payment would not abrogate a PACA trust. *See, Patterson*, 307 F.3d at 669 ("[A]n oral agreement for an extension or a course of dealing allowing more than 30 days for payment will not abrogate a PACA trust.")(citing *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 205 (1998), and *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777, 781–82 (8th Cir.1991)); *Lombardo*, 12 F.3d at 810, n. 3 ("This feature [a written agreement] distinguishes this case from *Hull Co.*, in which we refused to accord any meaning to an oral agreement to extend payment terms beyond those specified in the writ-

ten agreement."). Thus, while a written agreement extending the payment terms of the original written agreement beyond thirty days would cause a supplier to lose its PACA rights, an oral agreement or course of dealing extending the payment terms in the original written agreement would not.

■ This Court questions whether an agreement, written or otherwise, entered into *after* a seller has preserved its rights to the benefits of a PACA trust can effect an abrogation of that seller's PACA rights in light of the plain language of 7 C.F.R. § 46.46(c)(1), which provides, "Participants who preserve their rights to benefits in accordance with paragraph (f) of this section *remain beneficiaries until they are paid in full,*" (emphasis added), and similar language in 7 U.S.C. § 499e(c)(2), which provides, in part,

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, *until full payment of the sums owing in connection with such transactions has been received* by such unpaid suppliers, sellers, or agents.

(Emphasis added). The legal conclusion by the Seventh and Eighth Circuits, that a post-default written agreement relating to the payment of the PACA claim on any terms beyond thirty days from acceptance of delivery, precludes any possibility of a supplier ever entering into a written forbearance agreement without losing its PACA rights. A post-default e-mail ex-change as simple as a question from a buyer "Would you accept payment of the claim now?" with a response of from the seller of "Yes," would, under *Lombardo* and *Patterson,* constitute a waiver of the seller's trust rights. This result seems completely contrary to the express language of the PACA statute and regulations cited above, and to the policy underlying the passage of the 1984 amendments to PACA, which provides protection for suppliers of perishable agricultural commodities. It will discourage forbearance agreements and force sellers who have preserved their rights to the PACA trust benefits to enforce those rights or face the possibility that a post-default agreement made with a buyer in an attempt to obtain payment on a claim would be construed to be a waiver of trust rights. The ultimate result is that the retailers and buyers of perishable agricultural commodities would lose their PACA licenses and be forced out of business. *See, Patterson,* 307 F.3d at 671 ("Filing a PACA trust claim may be beneficial to [a seller] in the short run, but if it prevails it might put one of its large buyers out of business (because the USDA will revoke the dealer's license)."). This certainly cannot be the result that Congress intended and could be avoided simply by applying the plain meaning of the statute and regulation: once a supplier preserves its rights under a PACA trust, those rights remain until the supplier is "paid in full." Such a construction comports with the requirement that PACA and its regulations should be liberally construed in favor of the seller. *See, Patterson,* 307 F.3d at 671 (recognizing the "general principle" that "PACA is to be construed liberally in favor of sellers.")(citing *Hull Co.,* 924 F.2d at 782). However, because this Court finds that Dent, as agent for Cherrco, did not enter, and could not have entered, into a written agreement on behalf of Cherrco with the

Debtor extending the payment terms beyond thirty days, it need not decide this issue.

■ The Debtor admits that Cherrco properly preserved its rights to trust benefits pursuant to § 46.46(c)(1) of the regulations. The Debtor argues, however, that a post-default series of e-mails between Dent and Baldwin, the representative of the Debtor, constituted a "written agreement" extending the original payment terms beyond thirty days such that Cherrco lost its ability to assert its PACA rights against the Debtor. Apparently, after the Debtor defaulted in the payment of the amounts due Cherrco, and after Cherrco properly preserved its PACA rights, Baldwin and Dent, as agent for Cherrco, began negotiating a payment schedule that would satisfy Cherrco so that Cherrco would defer enforcement of its PACA rights. A payment schedule was sent to Dent, who then forwarded the payment schedule to Jim Jensen, a representative of Cherrco, and to Sarah Peterson–Schlukebir, a representative of Peterson Farms, Inc. In an e-mail dated October 10, 2002, Ms. Peterson–Schlukebir wrote to Jensen and Dent the following:

Tim:

As discussed verbally on 10/10/02, both Peterson Farms and CherrCo are not willing to sign the Promissory Note and Release dated 10/4/02 from Gene Baldwin from Furrs. If we sign the release, we are no longer covered by PACA. If the form is revised so that the form is only a Promissory Note it will be signed. Having had the opportunity to deal with the details of PACA over the last six months, we need to remain in accordance with the requirements if Furr's does file Chapter 11 or if payment in full is not made.

The Promissory Note and Release (written as is) will not be signed by a rep.

from Peterson Farms or CherrCo on the behalf of Peterson Farms Cooperative.

Sarah

On that same day, Dent sent an e-mail to Baldwin, with the above e-mail as an attachment, in which he wrote,

Please see below. This is the problem I have unexpectedly run into as noted. I think both parties would sign off if the "release" notation was removed and it was basically a promissory note.

Neither party will take further steps as long as the payment schedule is followed as best possible.

The "release" takes away the ability for either CherrCo, Inc. or PFI to utilize PACA if things go wrong altogether.

I am e-mailing this so you have their response in written form as necessary at your end.

I did not expect this but hope we can work it out. I am in hopes one word does not foul up all of your work and mine.

Later that day, Dent wrote another e-mail to Baldwin:

Great. do that and we are in gear.

At 01:07 PM 10/10/2002–0500, you wrote:

Will modify the note to remove the release language. We do not think this language keeps them from filing a PACA claim, but we will change anyway.

On October 11, 2002, Baldwin wrote an e-mail to Dent in which he stated:

Tim—What you faxed is ok we do not need a formal note. We will just start making the payments starting today. All we really want is the agreement from them that the payment plan is ok. We don't want to lose them as a supplier. We know we will have to pay up front for our orders until we get thru this situation. Thanks for all your help.

The Debtor argues that these e-mails constitute a writing evidencing an agreement between the parties extending the payment terms beyond thirty days and that Cherrco lost its PACA rights as a result of entering into the agreement. Cherrco argues that the e-mails do not satisfy the "writing" requirement and that the e-mail correspondence did not constitute an agreement between the parties regarding the payment terms.

This Court rejects Cherrco's argument that the e-mails do not constitute a "writing" because this issue was resolved by Congress with the passage, in June, 2000, of the Electronic Signatures in Global and National Commerce Act (the "E–Sign Act"), codified at 15 U.S.C. § 7001 et seq. The E–Sign Act, which had an effective date of October 1, 2000, provides, in pertinent part, at § 7001:

(a) In general

Notwithstanding any statute, regulation, or other rule of law (other than this subchapter and subchapter II of this chapter), with respect to any transaction in or affecting interstate or foreign commerce—

(1) a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form; and

(2) a contract relating to such transaction may not be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation.

(b) Preservation of rights and obligations

This subchapter does not—

(1) limit, alter, or otherwise affect any requirement imposed by a statute, regulation, or rule of law relating to the rights and obligations of persons under

such statute, regulation, or rule of law *other than a requirement that contracts or other records be written, signed, or in nonelectronic form.*

15 U.S.C. 7001(a) and (b)(1)(emphasis added). Thus, in transactions involving interstate commerce, e-mails constitute "writings." The transactions between Cherrco and the Debtor occurred in 2002, and clearly qualify for the requirement in § 7001(a) that the transaction is in or affects interstate commerce. Thus, the e-mails between the parties satisfy the writing requirement, to the extent that one is required under PACA.

■ The Court agrees with Cherrco, however, that the e-mail correspondence did not constitute an agreement between the parties extending the original payment terms beyond thirty days. In reviewing the correspondence set forth above, the Court finds that the e-mails do not evidence a "meeting of the minds" of the parties regarding the issue of the payment plan. Although Dent stated that "[n]either party will take further steps as long as the payment schedule is followed as best possible," it is clear from an e-mail from Baldwin to Dent, sent later on that same day, that Dent and Baldwin were still negotiating, because Baldwin was still talking about modifying the promissory note that the Debtor wanted Cherrco to sign. Neither Cherrco, nor Dent, on behalf of Cherrco, ever signed the promissory note that Baldwin said he was going to modify or any other promissory note. The last e-mail in the chain of correspondence was an e-mail from Baldwin to Dent which, again, indicates that there was never truly a written agreement extending the payment terms because he states, "[W]e do not need a formal note. We will just start making the payments starting today." At most, these e-mails establish that an oral agreement may have been made between

the parties or that the parties had established a course of dealing regarding the payment of this claim, but, as the Court noted above, such agreements or courses of dealing cannot strip a PACA claimant of its trust rights.

▆▆▆ Even if the e-mails between Dent and Baldwin could have been construed to represent an agreement between the parties extending the payment terms beyond thirty days, such an agreement would be ineffective because, under PACA, Dent did not have authority, as agent for Cherrco, to waive Cherrco's trust rights. The regulations under PACA are clearly intended to prevent an agent from doing any act that would waive its principal's rights under PACA without an · express written waiver by the principal clearly showing the *principal's* intent to waive its rights under PACA. Under § 46.46(c)(2),

> Persons acting as agents also have the responsibility to negotiate contracts which entitle their principals to the protection of the trust provisions: Provided, That a principal may elect to waive its right to trust protection. To be effective, the waiver must be in writing and separate and distinct from any agency contract, must be signed by the principal prior to the time affected transactions occur, must clearly state the principal's intent to waive its right to become a trust beneficiary on a given transaction, or a series of transactions, and must include the date the agent's authority to act on the principal's behalf expires.

7 C.F.R. § 46.46(c)(2). Further, under § 46.46(d)(2),

> Agents who sell perishable agricultural commodities on behalf of a principal are required to preserve the principal's rights as a trust beneficiary as set forth in § 46.2(z), (aa) and paragraphs (d), (f), and (g) of this section. Any act or omission which is inconsistent with this re-

sponsibility, including failure to give timely notice of intent to preserve trust benefits, is unlawful and in violation of Section 2 of the Act, (7 U.S.C. 499b).

7 C.F.R. § 46.46(d)(2). Because Dent was acting as Cherrco's agent, he did not have the authority under PACA to enter into any written agreement that would have waived Cherrco's rights to be a trust beneficiary. There is no evidence that Cherrco signed a written waiver of its right to trust protection that would satisfy the requirements of § 46.46(c)(2). The same e-mails alleged to constitute an agreement that waived Cherrco's rights under PACA show that Cherrco did not intend to waive its PACA rights and in fact was specifically trying to avoid signing anything that would waive its rights in the PACA trust. Jensen testified at the hearing on this matter that Cherrco never intended to waive its rights under PACA with respect to the transactions at issue. This testimony was corroborated by the testimony of Gene Baldwin, the Debtor's representative involved in these transactions, who testified that he believed that Cherrco did not intend to waive its rights under PACA. Thus, the Court finds that, even if the e-mails between Dent and Baldwin could be interpreted to constitute an agreement between the parties extending the terms of payment beyond thirty days, such agreements would have no effect because Dent, as agent for Cherrco, had no authority to enter into an agreement that would waive Cherrco's rights under PACA.

For these reasons, the Court grants Cherrco's motion to compel the payment of its PACA trust claim. In its Motion, Cherrco also asks this Court for an award of attorney's fees. Because there is no basis for this Court to award attorney's fees in this matter, the Court will deny that aspect of Cherrco's motion. *See, Golman–Hayden Co. v. Fresh Source Pro-*

*duce, Inc.,* 217 F.3d 348, 352 (5th Cir. 2000); *Hereford Haven, Inc. v. Stevens,* 1999 WL 155707, *4 (N.D.Tex. March 12, 1999).